**FILED**
**JULY 10, 2025**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| SPADER BAY CONDOMINIUM OWNERS ASSOCIATION, a Washington nonprofit corporation, | ) ) ) ) | No. 40142-1-III |
| Respondent, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| ROBERT J. THOMPSON and AMBER THOMPSON, individually and as the marital community comprised thereof, | ) ) ) ) ) | |
| Appellants. | ) ) | |

MURPHY, J. — The Spader Bay Condominium Owners Association (the Association) is managed by a board of directors (the Board) pursuant to a declaration of condominium and adopted bylaws. In October 2019, the Board adopted a resolution related to unit rentals. Robert and Amber Thompson, who jointly own three units, did not comply with the 2019 resolution. The Association brought suit against the Thompsons for breach of contract, seeking a declaratory judgment and injunctive relief, and ultimately moved for partial summary judgment on affirmative defenses and counterclaims asserted by the Thompsons in their answer to the complaint. The trial court granted partial summary judgment to the Association, dismissed the Thompson's affirmative defenses and counterclaims with prejudice, and ordered the Thompsons to comply with the

October 2019 resolution on unit rentals. The trial court later entered a judgment and decree of foreclosure in favor of the Association that included an award of $58,825.55 in attorney fees and costs.

The Thompsons appeal, arguing there is a genuine issue of material fact as to whether (1) the Association abandoned its right to control rental operations, (2) the October 2019 resolution violated the declaration of condominium's equal treatment clause, and (3) the October 2019 resolution violated Washington's Horizontal Property Regimes Act (HPRA), chapter 64.32 RCW. We disagree and affirm the trial court.

FACTS

Spader Bay Condominiums (Spader Bay), located on the shore of Lake Chelan, is comprised of 3 buildings with a total of 46 residential resort condominium units. The Spader Bay Condominium Owners Association is a Washington nonprofit corporation formed under the HPRA. The Association's members consist of the unit owners. Since 1986, Spader Bay has operated under the terms of a "Merger and Amendment of Declarations of Condominium for Spader Bay Condominium Groups I, II, and III" (the Declaration). Clerk's Papers (CP) at 33-82 (some capitalization omitted). All units "shall be held, used, conveyed, encumbered, leased, occupied, rented, and improved subject to the covenants, conditions, restrictions, and easements stated in this Declaration." CP at 44.

It is undisputed that the Declaration permits unit owners to rent out the units to others. Section 11.1 of the Declaration states that all Spader Bay "buildings and units are intended for and restricted to resort use on an ownership, rental, or lease basis, and for social, recreational, or other reasonable activities normally incident to such use, and for the purposes of operating the Association and managing the condominium if required." CP at 49.

Section 11.2 of the Declaration addresses the rental of units:

All occupancy of units offered for rent by the owners thereof shall be controlled by the Board *in the common interest of all owners* and in compliance with appropriate laws and ordinances. All units shall be rented through the Board or its designee. The Board shall establish policies and procedures governing the rental units and the management of rental operations and shall control all rental operations including the employment of necessary managerial, administrative and maintenance personnel, procurement of equipment, supplies and services, maintenance of financial books of account, and establishment of checking and savings accounts required for rental operations management. In the rental of units offered for rent by the owners, all owners offering units for rent shall be treated equally and the Board shall supervise rental operations to assure as far as possible fair and equal rental of the units.

CP at 49-50 (emphasis added).

Section 17.1 of the Declaration grants the Board the authority to adopt rules and regulations for the benefit of the Association:

The Board is empowered to adopt, amend, and revoke on behalf of the Association detailed administrative rules and regulations necessary or convenient from time to time to insure compliance with the general

3

> guidelines of this Declaration and to promote the comfortable use and enjoyment of the property. The rules and regulations of the Association shall be *binding upon all owners and occupants* and all other persons claiming any interest in the condominium.

CP at 57 (emphasis added).

Section 17.2 of the Declaration states that the "Board shall have the power and the duty to enforce the provisions of this Declaration, the Articles, the Bylaws, and the rules and regulations of the Association, as the same may be lawfully amended from time to time, for the benefit of the Association." CP at 58. For any legal action brought concerning the enforcement or interpretation of the Declaration, it expressly provides that "the prevailing party shall be entitled to judgment against the other party for its reasonable expenses, court costs, and attorney[] fees." CP at 58.

Article 20 of the Declaration addresses any failure of the Board to insist on strict performance or compliance with the Declaration, bylaws, or rules and regulations adopted by the Association:

> The failure of the Board in any instance to insist upon the strict compliance with this Declaration or the Bylaws or rules and regulations of the Association, or to exercise any right contained in such documents, or to serve any notice or to institute any action, *shall not be construed as a waiver or a relinquishment for the future* of any term, covenant, condition, or restriction. . . . No waiver by the Board of any requirement shall be effective unless expressed in writing and signed by the Board.

CP at 63 (emphasis added).

4

Article 30 is a severability clause:

> The provisions of this Declaration shall be independent and severable, and the unenforceability of any one provision shall not affect the enforceability of any other provision, if the remainder complies with the Condominium Statute or, as covenants, effect the common plan.

CP at 75.

Section 14.2 of the Declaration provided for the adoption of articles of incorporation, as well as bylaws to supplement the Declaration and provide for administration of the Association and Spader Bay. Consistent with the Declaration, section 3.2 of the bylaws grant the Board the "powers and duties provided for the administering authority of the condominium in the statutes and in the Declaration, and all other power necessary for the administration of the affairs of the Association" and allow the Board to "do all such acts and things as are not prohibited by statute or by the Declaration required to be done in another manner." CP at 87.

The Association's bylaws "provide for the operation of Spader Bay" and "apply to the entire condominium, each unit therein, and all common areas and facilities." CP at 84. The bylaws state:

> All present and future owners, mortgagees and other encumbrancers, lessees, tenants, licensees, and occupants of units, and their guests and employees, and any other person who may use the facilities of the condominium are subject to these Bylaws, the Merger and Amendment to Declarations of Condominium for Spader Bay Condominium Groups I, II

and III, a condominium, and the rules and regulations pertaining to use and operation of the condominium.

CP at 84.

Article 7 of the bylaws addresses rights of action for noncompliance:

Each owner, the Board, and the Association shall comply strictly with the Declarations, these Bylaws, and with the administrative rules and regulations adopted pursuant thereto, as they may be lawfully amended from time to time, the decisions of the Board . . . . Failure to comply with any of the foregoing shall be grounds for an action to recover sums due, damages, and for injunctive relief, or any or all of them . . . .

CP at 92.

The HPRA requires that each condominium owner "comply strictly with the bylaws and with the administrative rules and regulations adopted pursuant thereto, as either may be lawfully amended from time to time, and with covenants, conditions, and restrictions set forth in the declaration or in the deed to [their unit]." RCW 64.32.060.

*Historical enactment and enforcement of rules*

During the 1980s, the Association's Board regulated short-term rentals using a "'rental pool' system." CP at 391. Either the Board, or their designated rental agent "BJ Enterprises Ltd," managed the pool. CP at 391; *see also* Rep. of Proc. (RP) (Sept. 9, 2021) at 87-88. In the early 1990s, the Association ended the short-term rental pool and its relationship with BJ Enterprises and, thereafter, allowed unit owners to directly rent out their units.

In a declaration submitted in support of the Association's motion for partial summary judgment, the president of Association's Board stated that the Board has continuously "maintained quality standards for owners who chose to rent their units, in addition to rules regulating owner and renter conduct while at Spader Bay" since the 1980s. CP at 391. Numerous exhibits were appended to the Board president's declaration, including minutes of Board meetings, letters sent from the Board to unit owners or rental agents, and copies of renters' rules throughout the years. The preexisting rules included prohibitions on renters bringing pets, limiting the number of cars and boats per renter per unit, and setting quiet times, etc.

*2019 resolution*

Sometime between 2015 and 2016, Spader Bay noticed an increased volume in short-term vacation renters booking their stay through rental agencies such as "AirBnB" and "VRBO." CP at 388. According to the Board's president, "This new breed of renter brought new issues to Spader Bay," and these renters "tended to treat Spader Bay's common areas more harshly," caused "more excessive noise and other conduct issues" than unit owners and their family, friends, and guests, and required "more of Spader Bay's staff time to monitor and manage," creating "friction between those owners who rented and those who did not." CP at 388-89; *see also* CP at 475. In 2017, the Board initiated a survey of owners on the short-term rental issue. "The survey results showed

the vast majority of owners wanted new rules regulating short-term vacation rentals and stricter enforcement of the new and pre-existing Rental Rules." CP at 389. In March 2018, once the survey was complete, the Board approved revisions to the short-term rental rules for the upcoming season. CP at 479.

In October 2019, the Board passed a resolution requiring all owners of a unit, or their designated rental agent, who intended to rent out their unit beginning in 2020 to: (1) "execute and be bound" by a new "Agreement for Rental of Spader Bay Condominiums" (the Rental Agreement), (2) pay a $25 per night rental management fee to help offset Spader Bay's operational and administrative costs, and (3) have their renters execute a copy of the revised "Renters Rules" at check-in. CP at 106-07. The Rental Agreement contained a liquidated damages provision, requiring unit owners to pay $1,000 should the owner "misstate[] or misrepresent[] the status of a person using their unit(s) as a "'Guest'" when that person was actually a "'Renter.'" CP at 112-13.

The updated "Renters Rules" generally included the same historical rules and regulations contained in the "Renters Rules" from the years prior, such as forbidding pets, limiting the number of renters per unit, imposing quiet times, and requiring all renters and guests to check in with Spader Bay's property manager upon arrival. CP at 423-26, 487-93. The 2019 resolution additionally required all renters to "execute a copy of the Renters Rules" upon check-in with the Spader Bay property manager,

8

"evidencing their acknowledgment or receipt of the rules and agreement to be bound" by them. CP at 107.

According to the Rental Agreement, the updated rules related to short-term rentals were adopted "to maintain and enhance the value of the Spader Bay Condominiums and property, and ensure the comfortable use and enjoyment by Owners, Renters, and Guests of the Condominiums." CP at 110. The resolution required all owners who intended to receive rental income from their unit(s) to execute and be bound by the new Rental Agreement, which was "intended to make the Owners Rules, Renters Rules, and Guest Rules binding on each Owner, Renter, Guest, and Rental Agent, and to set forth the terms and conditions applicable to Owners, Renters, Guests, and Rental Agents." CP at 110. According to the Association, consent of the owners to the Board's adoption of the October 2019 resolution was not required under section 28.1 of the Declaration because this action of the Board did not amend either the Declaration or the bylaws. Notice of the adoption of the October 2019 resolution was given to each owner, including the Thompsons.

*The Thompsons*

Robert Thompson and Amber Thompson, who are husband and wife, jointly own three units at Spader Bay. They acquired their first unit in 1986 and two others in 1992. Beginning around 1993, when BJ Enterprises was no longer the designated rental agent

for Spader Bay, the Thompsons began regularly renting out their three units through independent efforts. The Thompsons "personally coordinated, managed, and administered" the rental of their units from 1993 until 2016, and from 2016 onward, they hired their own rental manager to take over and oversee their accounts, perform maintenance on their units, clean the units, and respond to complaints. CP at 524.

Up until the Board's adoption of the 2019 resolution, the Thompsons abided by the Association's rental rules. Thereafter, the Thompsons refused to comply with the new rules. They refused to sign the Rental Agreement and directed their rental manager not to sign, taking issue with both the liquidated damages clause and the $25 per night rental fee, believing "the Board was intending to profit off of the rental of [their] units without actually providing any of the services it is required to provide under Section 11.2 of the Declaration." CP at 525; *see also* CP at 27-28, 434-35, 445-46. The Thompsons continued to rent out their property but refused to pay the $25 per night rental fee, and directed their vacation renters not to check in with Spader Bay's rental manager and instead check in with their personal rental manager.

*Procedural history*

In July 2020, the Association sued the Thompsons for breach of contract, seeking a declaratory judgment, a preliminary injunction, and an award of damages, attorney fees, and costs. After the trial court denied the injunctive relief, the Thompsons answered the

complaint and raised several affirmative defenses and counterclaims that included breach of contract, promissory estoppel, negligence, and breach of fiduciary duty. The Thompsons averred that the Declaration does not grant the Association authority to adopt and enforce rules or, alternatively, that the Association had abandoned its right to enact or enforce its rules for rental of units. The Association answered the counterclaims and later moved for summary judgment dismissal of the Thompson's affirmative defenses and counterclaims. In response to the summary judgment motion, the Thompsons claimed that the Association was conflating its history of enacting and enforcing rental rules with its long-abandoned authority to control occupancy of units rented out by condominium owners. The Thompsons did not assert in their answer, affirmative defenses, counterclaims, or response to the Association's motion for partial summary judgment, that the Association violated any provisions of the HPRA.

After hearing argument of the parties, the trial court found that the Board possessed authority to enact and enforce rules for the Association, including rules regulating rental of the Thompson's units, and the Association had not abandoned its or the Board's authority to enact and enforce rules. The court granted partial summary judgment to the Association, dismissing the Thompson's affirmative defenses and counterclaims. The court further ordered that the Thompsons immediately comply with the Board's rules, and found that the Thompsons owed the Association "a per night, per

unit rental management fee for each rental of one or more" of the Thompsons' units, in an amount to be determined at trial or some other disposition. CP at 778. The court reserved ruling on the amount of attorney fees and costs owed by the Thompsons to the Association.

The parties later came to an agreement that the unpaid rental management fees totaled $10,100, and the Thompsons tendered that amount to the Association. The parties could not come to a consensus on the amount of attorney fees and costs, so the Association filed a motion to set the amount for attorney fees and costs and to reduce that amount to a money judgment that included a foreclosure decree. It also moved for contempt on the basis that the Thompsons were continuing to violate the Association's rental rules, including a refusal to execute the Association's Rental Agreement. The court declined to find the Thompsons in contempt but awarded the Association attorney fees and costs in the amount of $58,825.55, and a judgment and decree of foreclosure in that amount was entered that same day.

On August 30, 2022, the trial court entered an agreed order granting a second contempt motion filed by the Association. On December 13, 2023, the court entered a stipulated order of dismissal with prejudice.

The Thompsons appeal from the trial court's summary judgment dismissal of their affirmative defenses and counterclaims, and the judgment and decree of foreclosure on

12

the award of attorney fees and costs to the Association.

ANALYSIS

*Whether there is a disputed issue of material fact as to whether
the Association abandoned its right to regulate unit rentals*

The Thompsons contend the summary judgment dismissal of their affirmative

defenses and counterclaims was improper because issues of material fact remain as to

whether the Association abandoned its right to regulate rentals under section 11.2 of the

Declaration. The Thompsons argue that (1) the Board surrendered control of unit rental to

the owners in 1993, (2) there is an absence of evidence showing the Board's attempt to

control rentals between 1993 and 2019, and (3) there is an absence of the legal term

"abandonment" within the Declaration's no-waiver clause. To these arguments, the

Association responds that it did not surrender its authority to regulate unit rentals, and

instead there is evidence that demonstrates the rental rules were continuously maintained

by the Board.

This court engages in the same inquiry as the trial court when it reviews a trial

court's grant of summary judgment. *Mountain Park Homeowners Ass'n, Inc. v. Tydings*,

125 Wn.2d 337, 341, 883 P.2d 1383 (1994). Summary judgment is proper only when

there is no genuine issue of material fact and the moving party is entitled to judgment as a

matter of law. *Id*.; CR 56(c). The moving party bears the burden of proving they are

entitled to summary judgment as a matter of law. *Ross v. Bennett*, 148 Wn. App. 40, 49, 203 P.3d 383 (2008). Evidence and all reasonable inferences are viewed in the light most favorable to the nonmoving party, and all questions of fact are reviewed do novo. *Id*.; *Mountain Park*, 125 Wn.2d at 341.

### Abandonment

Whether evidence supports a finding of abandonment is a question of fact, unless reasonable minds could reach only one conclusion. *Green v. Normandy Park Riviera Section Cmty. Club, Inc.*, 137 Wn. App. 665, 697, 151 P.3d 1038 (2007); *see Mullor v. Renaissance Ridge Homeowners' Ass'n*, 22 Wn. App. 2d 905, 912, 516 P.3d 812 (2022).

Abandonment of a restrictive covenant is an equitable defense available to prevent enforcement of a covenant. *Mountain Park*, 125 Wn.2d at 341-42. Where a covenant has been "'habitually and substantially violated so as to create an impression that it has been abandoned, equity will not enforce the covenant.'" *Id*. at 342 (quoting *White v. Wilhelm*, 34 Wn. App. 763, 769, 665 P.2d 407 (1983)). To succeed in a defense of abandonment, evidence must show that "prior violations by other residents have so eroded the general plan as to make enforcement useless and inequitable." *Id*. "Violations must be material to the overall purpose of the covenant, and minor violations are insufficient to find abandonment." *Id*. Evidence of only a single violation will not support a finding of abandonment. *Id*.; *Reading v. Keller*, 67 Wn.2d 86, 90, 406 P.2d 634 (1965).

14

Here, the Thompsons argue the Board abandoned section 11.2 of the Declaration in 1993, when the Board allowed individual unit owners to rent their units, and, therefore, conclude that the 2019 resolution is unenforceable. For ease of reference, section 11.2 states:

> All occupancy of units offered for rent by the owners thereof shall be controlled by the Board in the common interest of all owners and in compliance with appropriate laws and ordinances. All units shall be rented through the Board or its designee. The Board shall establish policies and procedures governing the rental units and the management of rental operations and shall control all rental operations including the employment of necessary managerial, administrative and maintenance personnel, procurement of equipment, supplies and services, maintenance of financial books of account, and establishment of checking and savings accounts required for rental operations management. In the rental of units offered for rent by the owners, all owners offering units for rent shall be treated equally and the Board shall supervise rental operations to assure as far as possible fair and equal rental of the units.

CP at 49-50.

It is undisputed that the Board parted ways with its designated rental agent, BJ Enterprises Ltd., stopped using a rental pool to manage unit rentals, and allowed individual unit owners to rent out their units themselves. *See* CP at 391-92. The record additionally shows that the Thompsons personally coordinated, managed, and administered the rental of their three units from 1993 until 2016, after which time they hired a rental agen to oversee their accounts, perform maintenance on their units, clean the units after the renters left, and respond to renters in the event of complaints. It is also

15

undisputed that the Board did not retain control of "all" aspects of rental operations enumerated in section 11.2.

The Thompsons argue that section 11.2 requires the Board to govern each and every aspect of rentals, and its failure to do so constitutes abandonment. They assert that the repeated use of the word "shall" within section 11.2 creates a strict mandate on the Board, and the use of the word "all" ensures that the Board's authority reaches all units, all rental operations, and all owners. The Thompsons claim that this demonstrates the intent to require the Board to operate each and every aspect of all rentals, including, but not limited to, "'the employment of necessary managerial, administrative [and] maintenance personnel, procurement of equipment, supplies and services, maintenance of financial books of account, and establishment of checking and savings accounts required for rental operations management.'" Br. of Appellants at 9 (quoting CP at 49). While the Board's "Renters Rules" implemented since the 1980s undoubtedly falls within the category of rules and procedures intended to be enacted by section 11.2, (1) the Board no longer controls "[a]ll occupancy of units offered for rent," (2) "[a]ll units" have not been "rented through the Board or its designee" since 1993, and (3) "all rental operations" have not been controlled by the Board since 1993. CP at 49-50.

While the Thompsons are correct that these instances demonstrate certain aspects of Section 11.2 have, since 1993, not been controlled by the Board, other evidence shows

that the Board has consistently and continuously adopted, modified, and enforced

"policies and procedures governing the rental units and the management of rental

operations," CP at 49, in the form of rules for short-term rental of units since the 1980s,

which continued through and after the 1990s. *See* CP at 453-85 (Board meeting minutes

discussing new rules and enforcement of existing rules from various years between 1990

and 2019); CP at 487-93 ("Renters Rules" from 2015, 2016, 2018, 2019).

The evidence presented to the trial court shows that the Board has over the years

consistently sought to enforce rules for and regulate short-term rentals of condominium

units. *See* CP at 463 (2000 board meeting minutes stating manual of revised rules and

regulations would be provided to each unit and made readily available for renters and

guests); CP at 464 (2001 meeting minutes updating rules and regulations for owners and

renters); CP at 468 (2008 meeting minutes on issues related to noncompliance by owners

and renters to rules); CP at 470 (2012 meeting minutes asking owners to pass along rules

to renters, and noting a discussion by the Board on adopting a "'resort fee'" to offset

additional administrative expenses related to rentals); CP at 472 (2016 meeting minutes

noting that updated rules have been distributed with the minutes); CP at 475 (2016

minutes noting that updated owner and rental rules were distributed last month and issues

related to owners and renters smoking on the Spader Bay property); CP at 478 (2018

17

meeting minutes noting that both renters and guests of owners are not allowed to have nonservice dogs on the property).

Board meeting minutes in the record on review that span the years 1990 to 2017 document rental rules over the years that touch on the following subjects (1) the minimum number of days for a rental period, and the maximum number of guests and the maximum number of cars and/or boats allowed per rental unit, (2) the general condition the units are to meet, (3) that amenities should be in good working order, (4) that there be an adequate supply of dishes, silverware, pots and pans in the units, (5) that all units have a telephone, (6) the hiring of a property manager to enforce the rules, (7) the prohibition on renters bringing pets on the premises, and (8) restrictions on smoking. CP at 453-78.

The evidence, therefore, shows that the Board at regular intervals consistently adopted rental policies and procedures, and that the Board modified and added rules based on the changing "common interest of all owners." CP at 49-50.

While an argument could be made that allowing individual owners since 1993 to rent out their units themselves constitutes a violation of section 11.2 of the Declaration, the evidence does not show that "prior violations by other residents have so eroded the general plan as to make enforcement useless and inequitable." *Mountain Park*, 125 Wn.2d at 342.

18

It is notable that the Thompsons do not address the applicability of other provisions within the Declaration and bylaws relevant to the Board's authority to adopt the 2019 resolution. Declaration sections 17.1 (Adoption of Rules and Regulations) and 17.2 (Enforcement of the Declaration, etc.), and bylaws section 3.2 (Powers and Duties) grant the Board broad power to adopt, amend, and revoke rules and regulations for Spader Bay. These provisions provide a basis for new rules, such as the 2019 resolution, to be adopted by the Board to address issues as they arise, in the same way the evidence here shows the Board has historically responded to changing circumstances. Even with the Board not managing each and every aspect of rentals, which arguably is a degree of erosion to section 11.2 of the Declaration, the Board did not abandon its broad right granted under separate provisions within the Declaration and bylaws to enact, amend, and enforce rental rules for Spader Bay. *See Hagemann v. Worth*, 56 Wn. App. 85, 89, 782 P.2d 1072 (1989) (holding the violation of one covenant did not affect the enforcement of another covenant in the same agreement); *Mountain Park*, 125 Wn.2d at 342-43.

*No-waiver clause*

The Thompsons argue the "no-waiver" clause under section 20 of the Declaration does not insulate the Board from acts of abandonment. Section 20 reads, in relevant part:

> The failure of the Board in any instance to insist upon the strict compliance with this Declaration or the Bylaws or rules and regulations of the Association, or to exercise any right contained in such documents, or to

> serve any notice or to institute any action, shall not be construed as a waiver or a relinquishment for the future of any term, covenant, condition, or restriction.

CP at 63.

The Thompsons argue the doctrine of estoppel, upon which they claim abandonment is based, differs from the concept of waiver. "'[*W*]*aiver is unilateral* and arises by the intentional relinquishment of a right, or by a neglect to insist upon it, while an estoppel presupposes some conduct or dealing with another by which the other is induced to act, or to forbear to act.'" *Blue Ribbon Farms Prop. Owners' Ass'n v. Mason*, 31 Wn. App. 2d 1, 20-21, 547 P.3d 927 (2024) (quoting *Bowman v. Webster*, 44 Wn.2d 667, 670, 269 P.2d 960 (1954)).

Even assuming the Thompsons' interpretation of the waiver clause is correct, the severability clause under article 30 of the Declaration protects the Board from the possibility that it abandoned its section 11.2 powers. As previously stated, even if the Board could be found to have abandoned section 11.2, it did not abandon its broad right under sections 17.1 and 17.2 of the Declaration, and section 3.2 of the bylaws, to enact, amend, and enforce Spader Bay's rules and regulations for short-term rental of condominium units. Therefore, the 2019 resolution remains enforceable.

*Whether the Association's rental rules violate the Declaration's
equal owner treatment language*

The Thompsons argue that even if the Board did not abandon its right to regulate
rentals, its adoption of the 2019 rental regulations violated the equal owner treatment
language in section 11.2 of the Declaration. To this argument, the Association responds
that the equal owner treatment language does not require the Association to have
identical rules for short-term and long-term rentals, but, rather, provides that the
Association shall treat *owners* equally when the Association, or its designee, books
renters into units. We agree with the Association's interpretation of the equal owner
treatment language.

The primary objective in interpreting restrictive covenants is to determine the
intent of the drafting parties. *Riss v. Angel*, 131 Wn.2d 612, 621, 934 P.2d 669 (1997).
Courts "place 'special emphasis on arriving at an interpretation that protects the
homeowners' collective interests.'" *Id.* at 623-24 (quoting *The Lakes at Mercer Island
Homeowners Ass'n v. Witrak*, 61 Wn. App. 177, 180-81, 810 P.2d 27 (1991)). In
Washington, "the intent or purpose of the covenants, rather than free use of the
[property], is the paramount consideration in construing restrictive covenants." *Id.* at 623.

"While interpretation of the covenant is a question of law, the drafter's intent is a
question of fact." *Ross*, 148 Wn. App. at 49. "But where reasonable minds could reach

21

but one conclusion, questions of fact may be determined as a matter of law." *Id.* at 49-50.
Courts must consider the plain language of the covenant and the written instrument as a
whole. *Wilkinson v. Chiwawa Cmtys. Ass'n*, 180 Wn.2d 241, 250-51, 327 P.3d 614
(2014).

Here, the relevant language in section 11.2 of the Declaration provides, "In the
rental of units offered for rent by the owners, *all owners* offering units for rent shall be
treated equally, and the Board shall supervise rental operations to assure *as far as
possible* fair and equal rental of the units." CP at 49-50 (emphasis added). This clause
applies only to the equal treatment of all *owners* who offer their unit for rent. The clause
does not provide that all renters or rental-types, i.e., short-term and long-term, must be
treated equally.

Further, the inclusion of the phrase "as far as possible" in section 11.2 of the
Declaration, CP at 50, is an indicator that the provision is qualified. "'Central to the
concept of condominium ownership is the principle that each owner, in exchange for the
benefits of association with other owners, "must give up a certain degree of freedom of
choice which he [or she] might otherwise enjoy in separate, privately owned property."'"
*Shorewood W. Condo. Ass'n v. Sadri*, 140 Wn.2d 47, 53, 992 P.2d 1008 (2000)
(alteration in original) (quoting *Noble v. Murphy*, 34 Mass. App. Ct. 452, 456, 612
N.E.2d 266 (1993)). Additionally, the HPRA subjects all owners to the chapter and

22

"to the declaration and bylaws of the association of apartment owners adopted pursuant to the provisions of this chapter." RCW 64.32.250(1). With this in mind, and in light of the emphasis on protecting the collective interests, the equal owner treatment language in section 11.2 is read as allowing rentals, but subject to rules or regulations that serve the collective or common interests of the condominium owners, the Declaration, the bylaws, and the HPRA.

As such, applying restrictions or limitations on short-term rentals does not violate the provision on equal treatment owners, so long as the owners are treated equally in the application of the rules, the rules serve the common interest of Spader Bay, and are within the bounds of the Declaration, the bylaws, and the HPRA. There is no evidence that the Association applied its rules unequally.

*Whether the Association's adoption of changes to rental rules in October 2019 violated the HPRA*

The Thompsons claim the Board's failure to record an amended Declaration adopting changed rental rules and regulations violates the HPRA and, therefore, the changes are unenforceable. In response, the Association first urges this court to decline review of this issue on the basis that the Thompsons raised this issue for the first time on appeal. Alternatively, the Association argues that even if this court were to consider this

argument, the 2019 resolution does not prohibit rentals and, therefore, there was no violation of the HPRA.

"Issues and contentions neither raised by the parties nor considered by the trial court when ruling on a motion for summary judgment may not be considered for the first time on appeal." *Green*, 137 Wn. App. at 687; *see* RAP 9.12. "'The purpose of this limitation is to effectuate the rule that the appellate court engages in the same inquiry as the trial court.'" *Gartner, Inc. v. Dep't of Revenue*, 11 Wn. App. 2d 765, 777, 455 P.3d 1179 (2020) (quoting *Mithoug v. Apollo Radio of Spokane*, 128 Wn.2d 460, 462, 909 P.2d 291 (1996) (per curiam)).

The Thompsons argue RAP 9.12 only requires there be evidence "on file" with the trial court for this court to grant review of that issue. The Thompsons rely on *Keck v. Collins*, 181 Wn. App. 67, 325 P.3d 306, 313 (2014), in support of their argument. *Keck*, however, discussed whether *evidence* could be reviewed by the appellate court, not whether an *issue* not raised with the trial court could be reviewed on appeal. *Id*. at 81. The Thompson's argument is unhelpful in the context in which it is made.

In this case, neither the Association nor the Thompsons made any arguments based on the HPRA in their summary judgment submissions. However, the HPRA was

24

raised in arguments by both parties in relation to the Association's unsuccessful motion

for injunctive relief.[1] As the HPRA was raised in the trial court, we review it on appeal.

"All condominiums are statutorily created." *Shorewood*, 140 Wn.2d at 52. The

Spader Bay Condominiums was formed in 1986, and is governed by the HPRA. As the

Thompsons argue that in granting partial summary judgment the trial court relied on an

incomplete recitation of the law in *Shorewood*, that is where we begin our analysis.

In *Shorewood*, a condominium owner disputed the enforceability of an amendment

to the bylaws of a condominium owners' association that prohibited, with limited

exceptions, rental or leasing of condominium units. *Id.* at 50. The declaration that

established the condominium under the HPRA already restricted the condominium to

residential purposes only and units to single-family use, but allowed rental and leasing

of units as long as the rental or leasing term exceeded 30 days. *Id*. After concerns were

raised about rentals and leasing diminishing the value of the condominium units, the

association's board recommended an amendment to the bylaws to prohibit unit rental or

leasing. *Id*. The bylaw amendment was approved by over 70 percent of the condominium

---

[1] In a declaration submitted in support of the Association's motion for a preliminary injunction, Spader Bay's property manager appended materials purportedly distributed by the Thompsons to other condominium owners, prior to the initiation of litigation, arguing that the Board's adoption of the October 2019 resolution was in violation of the HPRA. *See* CP at 139, 149-56.

owners. *Id*. The Supreme Court held that the "[HPRA] does not allow an association of apartment owners to restrict leasing in a bylaw where the declaration itself permits leasing." *Id.* at 57. The Supreme Court declared the bylaw amendment prohibiting rental and leasing of units invalid and unenforceable. *Id*.

The Thompsons claim that the Board's 2019 resolution constituted a new rental regulation regime, entirely separate and unrelated to the expressly defined section 11.1 "purposes," and the rental "controls" originally identified in section 11.2 of the Declaration. The Thompsons argue that the following apply *only* to short-term rentals: (1) owners to pay $25 per night fee, (b) renters to check in with the Spader Bay property manager before assuming occupancy, and (3) owners to sign an "Agreement for Rental," containing liquidated damages. Therefore, the Thompsons argue that the Association was required under *Shorewood* to first amend the Declaration for the 2019 resolution to be enforceable.

Unlike *Shorewood*, where the condominium association sought to prohibit all rentals and leasing, which was contrary to the stated purposes laid out in that condominium association's declaration, the Association here did not seek to ban unit rentals. Rather, the Association added conditions for unit rentals with penalties identified should an owner not comply.

Section 11.1 of the Declaration permits the "rental" or "lease" of units, without limitation. CP at 49. Section 11.2 places some limitations on rentals and establishes that all rental operations and management are subject to the Board's control, "including the employment of necessary managerial, administrative and maintenance personnel, procurement of equipment, supplies and services, maintenance of financial books of account, and establishment of checking and savings accounts required for rental operations management." CP at 49.

A general term used in combination with specific terms will be interpreted to include "only those things that are in the same class or nature of the specific ones." *Viking Bank v. Firgrove Commons 3, LLC*, 183 Wn. App. 706, 716, 334 P.3d 116 (2014). As applied here, the $25 per night fee goes toward offsetting property management costs. This is related to the "employment of necessary managerial" personnel. Requiring guests to check in with management does not place a limit on use.

With regard to the liquidated damages provision in the Rental Agreement, the purpose is to require compliance with the renters rules by both renters and unit owners. If the rules are followed, the unit owners are free to rent. Article 17 of the Declaration expressly grants the Board the power to "adopt, amend, and revoke on behalf of the Association detailed administrative rules and regulations necessary or convenient from

27

time to time to ensure compliance with the general guidelines of this Declaration."

CP at 386. The liquidation damages provision falls within this authority.

In opposition to the Association's motion for attorney fees/costs and for contempt,

Robert Thompson submitted a declaration where he appended rules for owners, owners

who rent, renters and visitors dated March 8, 2022. The Thompsons point out that the

Association now prohibits any rentals around the Independence Day and Memorial Day

holidays. These rules postdate the order for summary judgment at issue in this appeal.

As the Thompsons did not challenge these rules in the trial court, they may not now

challenge them for the first time on appeal. *See* RAP 9.12.

To the extent the Board's 2019 resolution places restrictions on use, the

restrictions imposed are sufficiently within the limitations proscribed within the

Declaration and bylaws. As such, the 2019 resolution does not run afoul of the HPRA.

## ATTORNEY FEES

The Thompsons request an award of attorney fees and costs under RAP 18.1 and

section 19.5 of the Declaration. They also seek reversal of the trial court's attorney fee

and cost award to the Association. The Association requests an award of attorney fees

and costs pursuant to RAP 18.1 and sections 17.2 and 19.5 of the Declaration.

"'A contractual provision for an award of attorney[] fees at trial supports an award

of attorney[] fees on appeal under RAP 18.1.'" *Thompson v. Lennox*, 151 Wn. App. 479,

491, 212 P.3d 597 (2009) (quoting *W. Coast Stationary Eng'rs Welfare Fund v. City of Kennewick*, 39 Wn. App. 466, 477, 694 P.2d 1101 (1985)).

Section 19.5 of the Declaration provides:

> In any action to collect delinquent assessments, the prevailing party shall be entitled to recover as part of its judgment a reasonable sum for attorneys' fees and expenses reasonably incurred in connection with the action, in addition to taxable costs permitted by law.

CP at 62.

Section 17.2 of the Declaration provides in relevant part:

> If a legal action is brought to interpret or enforce compliance with the provisions of this Declaration, the Articles, the Bylaws, or the rules or regulations of the Association, the prevailing party shall be entitled to judgment against the other party for its reasonable expenses, court costs, and attorney's fees in the amount awarded by the court.

CP at 58.

The Association is the prevailing party on review. Pursuant to Sections 17.2 and 19.5 of the Declaration, we award the Association its attorney fees and costs on appeal. The Thompson's request for attorney fees and costs is denied.

## CONCLUSION

We affirm the trial court's order granting partial summary judgment to the Association, its order awarding attorney fees and costs, and judgment and decree of foreclosure. We also award the Association its reasonable attorney fees and costs on

appeal, subject to its compliance with RAP 18.1(d).

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Murphy, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Cooney, J.